# UNITED STATES DISTRICT COURT
# DISTRICT OF IDAHO

| | |
|---|---|
| JEFFREY JOSEPH ENNIS, | Case No.: 2:14-CV-00335-REB |
| Petitioner, | **MEMORANDUM DECISION AND ORDER** |
| vs. | |
| CAROLYN. W. COLVIN, Commissioner of Social Security; | |
| Respondent. | |

Pending before this Court is Jeffrey Joseph Ennis's Petition for Review (Docket No. 1), seeking review of the Social Security Administration's ("SSA") final decision to deny his claim for Social Security Disability Benefits for lack of disability. The action is brought pursuant to 42 U.S.C. § 405(g). Having carefully reviewed the record and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I. ADMINISTRATIVE PROCEEDINGS

On July 1, 2011, Jeffrey Joseph Ennis ("Petitioner") filed a Title II application for a period of disability and disability insurance benefits. Petitioner alleged disability beginning March 19, 2009. This claim were initially denied on September 8, 2011 and, again, on reconsideration on November 3, 2011. On or around November 10, 2011, Petitioner timely filed a Request for Hearing before an Administrative Law Judge ("ALJ"). On May 16, 2013, ALJ Gene Duncan held a video hearing in Tacoma, Washington, at which time, Petitioner, represented by attorney Mark B. Jones, appeared and testified. Impartial medical expert,

**MEMORANDUM DECISION AND ORDER - 1**

William A. Rack, M.D., and impartial vocational expert, Patricia B. Ayerza, also appeared and testified during the same May 16, 2013 hearing.

On May 31, 2013, the ALJ issued a Decision denying Petitioner's claims, finding that Petitioner was not disabled within the meaning of the Social Security Act. Petitioner timely requested review from the Appeals Council on June 24, 2013. On June 20, 2014, the Appeals Council denied Petitioner's Request for Review, making the ALJ's decision the final decision of the Commissioner of Social Security.

Having exhausted his administrative remedies, Petitioner timely files the instant action, arguing that "[t]he conclusions and findings of fact of the defendant are not supported by substantial evidence and are contrary to law and regulation." Compl., p. 2 (Docket No. 1). In this regard, Petitioner makes a multitude of related arguments, including: (1) the ALJ had a duty to address an earlier hearing in the Decision; (2) the Decision incorrectly stated Dr. Rack's testimony at the hearing; and (3) the ALJ improperly gave no weight to Petitioner's orthopedist, Dr. Michael D. DiBenedetto. *See generally* Pet.'s Brief, pp. 6-15 (Docket No. 16). Petitioner therefore requests that the Court reverse the ALJ's May 31, 2013 Decision or remand the action for a further proceedings. *Compare id.* at pp. 15-17 (insisting that reversal "is not only the best resolution, but the only fair way to resolve this matter for Petitioner"), *with* Compl., p. 2 (Docket No. 1) (requesting that Court "[r]emand the case for a further hearing").

## II. STANDARD OF REVIEW

To be upheld, the Commissioner's decision must be supported by substantial evidence and based on proper legal standards. 42 U.S.C. § 405(g); *Matney ex. rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992); *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990).

**MEMORANDUM DECISION AND ORDER - 2**

Findings as to any question of fact, if supported by substantial evidence, are conclusive.  42

U.S.C. § 405(g).  In other words, if there is substantial evidence to support the ALJ's factual

decisions, they must be upheld, even when there is conflicting evidence.  *Hall v. Sec'y of Health,*

*Educ. & Welfare*, 602 F.2d 1372, 1374 (9th Cir. 1979).

"Substantial evidence" is defined as such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971);

*Tylitzki v. Shalala*, 999 F.2d 1411, 1413 (9th Cir. 1993); *Flaten v. Sec'y of Health & Human*

*Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).  The standard requires more than a scintilla but less

than a preponderance (*see Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975);

*Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)), and "does not mean a large or

considerable amount of evidence."  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

With respect to questions of fact, the role of the Court is to review the record as a whole

to determine whether it contains evidence that would allow a reasonable mind to accept the

conclusions of the ALJ.  *See Richardson*, 402 U.S. at 401; *see also Matney*, 981 F.2d at 1019.

The ALJ is responsible for determining credibility and resolving conflicts in medical testimony

(*see Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)), resolving ambiguities (*see Vincent ex.*

*rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984)), and drawing inferences

logically flowing from the evidence (*see Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir.

1982)).  Where the evidence is susceptible to more than one rational interpretation in a disability

proceeding, the reviewing court may not substitute its judgment or interpretation of the record

for that of the ALJ.  *Flaten*, 44 F.3d at 1457; *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir.

1985).

**MEMORANDUM DECISION AND ORDER - 3**

With respect to questions of law, the ALJ's decision must be based on proper legal standards and will be reversed for legal error. *Matney*, 981 F.2d at 1019. The ALJ's construction of the Social Security Act is entitled to deference if it has a reasonable basis in law. *See id.* However, reviewing federal courts "will not rubber-stamp an administrative decision that is inconsistent with the statutory mandate or that frustrates the congressional purpose underlying the statute." *Smith v. Heckler*, 820 F.2d 1093, 1094 (9th Cir. 1987).

### III.  DISCUSSION

**A.      Sequential Process**

In evaluating the evidence presented at an administrative hearing, the ALJ must follow a sequential process in determining whether a person is disabled in general (*see* 20 C.F.R. §§ 404.1520, 416.920) – or continues to be disabled (*see* 20 C.F.R. §§ 404.1594, 416.994) – within the meaning of the Social Security Act.

The first step requires the ALJ to determine whether the claimant is engaged in substantial gainful activity ("SGA"). 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). SGA is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a), 416.972(a). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized. 20 C.F.R. §§ 404.1572(b), 416.972(b). If the claimant has engaged in SGA, disability benefits are denied, regardless of how severe his physical/mental impairments are and regardless of his age, education, and work experience. 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not engaged in SGA, the analysis proceeds to the second step. Here, the ALJ found that Petitioner has not engaged in substantial gainful activity since March 19, 2009, the alleged disability onset date. (AR 14).

**MEMORANDUM DECISION AND ORDER - 4**

The second step requires the ALJ to determine whether the claimant has a medically determinable impairment, or combination of impairments, that is severe and meets the duration requirement.  20 C.F.R. § 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  An impairment or combination of impairments is "severe" within the meaning of the Social Security Act if it significantly limits an individual's ability to perform basic work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.  20 C.F.R. §§ 404.1521, 416.921. If the claimant does not have a severe medically determinable impairment or combination of impairments, disability benefits are denied.  20 C.F.R. §§ 404.1520(c), 416.920(c).  Here, the ALJ found that Petitioner had the following severe impairments: (1) "right thumb ligament repair with some instability"; (2) "post right carpal tunnel release numbness in right middle finger and index finger tip numbness"; and (3) "arthropathy at L4-L5 and L5-S1 and anterolisthesis results in a low back pain syndrome."  (AR 14).[1]

The third step requires the ALJ to determine the medical severity of any impairments; that is, whether the claimant's impairments meet or equal a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the answer is yes, the claimant is considered disabled under the Social Security Act and benefits are awarded.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant's impairments neither meet nor

---

[1]  The ALJ also found that Petitioner had the "additional medically determinable impairment of asthma," but found that this impairment was not severe "because it does not pose more than minimal limitations to his ability to perform basic work activities."  (AR 15).

**MEMORANDUM DECISION AND ORDER - 5**

equal one of the listed impairments, the claimant's case cannot be resolved at step three and the evaluation proceeds to step four. *Id*. Here, the ALJ concluded that Petitioner's above-listed impairments, while severe, do not meet or medically equal, either singly or in combination, the criteria established for any of the qualifying impairments. (AR 15).

The fourth step of the evaluation process requires the ALJ to determine whether the claimant's residual functional capacity is sufficient for the claimant to perform past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. §§ 404.1545, 416.945. Likewise, an individual's past relevant work is work performed within the last 15 years or 15 years prior to the date that disability must be established; also, the work must have lasted long enough for the claimant to learn to do the job and be engaged in substantial gainful activity. 20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), 416.965. Here, the ALJ determined that Petitioner has the residual functional capacity to perform light work as follows: (1) "[h]e can lift and/or carry 20 pounds occasionally and 10 pounds frequently in an eight-hour workday"; (2) "[h]e can stand and/or walk for four hours and sit for six hours in an eight-hour workday"; (3) "[h]e can occasionally perform postural movements"; (4) "[h]e cannot climb ladders"; (5) "[h]e cannot work at heights or near hazards"; (5) "[h]e cannot work with heavy or vibrating equipment"; (6) "[h]e cannot work with power tools"; (7) "[h]e cannot intensely twist his upper body"; (8) "[h]e can frequently reach, grip, handle, and fine finger with his right upper extremity"; (9) "[h]e can have moderate interaction with the general public;" (10) "[h]e is off task 5% of the workday"; (11) "[h]e cannot have former inmates as co-workers"; (12) "[h]e must have his own space or job area"; and (13) "[h]e needs a sit/stand option at work." (AR 15-20).

**MEMORANDUM DECISION AND ORDER - 6**

In the fifth and final step, if it has been established that a claimant can no longer perform past relevant work because of his impairments, the burden shifts to the Commissioner to show that the claimant retains the ability to do alternate work and to demonstrate that such alternate work exists in significant numbers in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v), 404.1520(f), 416.920(f); *see also Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993).  If the claimant is able to do other work, he is not disabled; if the claimant is not able to do other work and meets the duration requirement, he is disabled.  Here, the ALJ found that Petitioner cannot perform his past relevant work as a jailer commander or data entry operator due to the above-referenced residual functional capacity.  (AR 20).  Still, considering Petitioner's age, education, work experience, and residual functional capacity, the ALJ found that he had "acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy," including information clerk, police aide, case aide, bailiff, and police records clerk.  (AR 21-22).

**B.     Analysis**

Petitioner's briefing takes the form of a recitation of various facts in the record, followed by arguments that are largely unaccompanied by any legal authority.  Regardless, Petitioner makes three distinct arguments to this Court – first, the ALJ had a duty to discuss the earlier, December 14, 2012 hearing (not just the May 16, 2013 hearing), in the May 31, 2013 Decision; second, the Decision incorrectly stated Dr. Rack's testimony at the May 16, 2013 hearing; and third, the ALJ improperly gave no weight to Petitioner's orthopedist.  *See generally* Pet.'s Brief, pp. 6-15 (Docket No. 16).  Each of these arguments is addressed below.

**MEMORANDUM DECISION AND ORDER - 7**

1.      The ALJ's Failure to Reference the December 14, 2012 Hearing Does Not Render
        the May 31, 2013 Decision as Lacking in Substantial Evidence

The May 31, 2013 Decision makes reference only to the May 16, 2013 video hearing; there is no mention of the December 14, 2012 hearing. *See generally* (AR 12-22). According to Petitioner, "the ALJ had a duty to discuss the first hearing in the Decision" because "this testimony was quite favorable for the Petitioner." Pet.'s Brief, pp. 6-7 (Docket No. 16); *see also* Pet.'s Resp. Brief, p. 1 (Docket No. 18) ("Evidence was obtained from a vocational expert at this first hearing which was material to the decision-making process, and which was favorable to the claimant."). The undersigned disagrees.

Petitioner accurately points out that, at times, the exchange between the ALJ and the impartial vocational expert during the December 14, 2012 hearing, Jinnie Lawson, was "rather confusing." *Id*. at p. 6. However, any confusion is immaterial when understanding that the ALJ *ultimately adopted* Ms. Lawson's testimony concerning Petitioner's ability to perform his past relevant work. On this issue, Ms. Lawson testified:

> ALJ:    All right. Let's assume we're dealing with an individual who's the same age as the claimant, has the same educational background, and past work experience; further assume that the claimant retains the residual functional capacity for detailed, medium-level work with the following additional limitation: occasional postural movements; could not climb ladders, work at heights; be limited to frequent reaching, gripping, and handling with the right upper extremity and by that, I mean three hours per day.
>
> VE:     That was reaching and handling?
>
> ALJ:    That – yeah, frequent, but three hours a day.
>
> VE:     But it was reaching and handling or just reaching?
>
> ALJ:    Reaching and handling.
>
> VE:     Thank you.

**MEMORANDUM DECISION AND ORDER - 8**

ALJ:     No intense twisting of his upper body; is able to meet the public on an occasional basis.  Let's leaving it at that.

         *Can this individual perform any of the claimant's past jobs as actually performed by the claimant or generally performed in the national economy?*

VE:      No, due to the limited use of his right hand.

ALJ:     Did you say no?

VE:      Yes, I said no.

ALJ:     On what basis –

VE:      Due to the –

ALJ:     – for the national economy?

VE:      – due to the limited use of the right hand and the occasional – also the occasional working with the public.  Where he wouldn't be working with the general public, he would be working with the inmate population.

ALJ:     That's known as a captive public, I would say.

VE:      Yeah, sort of.

ALJ:     There – if there is such a thing.  Why couldn't he – why couldn't he do the rest of *the* job –

VE:      What rest of the jobs?

ALJ:     – as it is done in the national economy?

VE:      *He didn't have any other jobs.  He only had the one as chief jailer.*

ALJ:     Why couldn't he do *that job* as it's done in the national economy?

VE:      As it's done in the national economy?  Let me look at something.  Just a second.  It does say – indicate that it's reaching and handling are frequent.

ALJ:     What's he handling frequently? . . . .


**MEMORANDUM DECISION AND ORDER - 9**

VE:     – reaching and handling three hours a day max and according to the DOT, reaching and handling are required frequently which would be two-thirds of the day and the three hours would be more like barely over occasionally.

ALJ:    But it isn't, it's frequent.

VE:     Well, if you're looking at frequent on an eight hour a day job, frequent would be about six hours – up to six hours.

ALJ:    No, I'd have to disagree with you.  I think it'd be – frequent is at – above occasional.

VE:     Yes.

ALJ:    So three hours is above occasional.

VE:     Occasional – occasional is zero to about two and a half hours and then frequent goes up to about six hours.

ALJ:    From two and a half hours.

VE:     Okay.  But it's barely there.  The three hours is three hours –

ALJ:    So in –

VE:     – and frequent by the DOT is up to six hours.

ALJ:    Can they do the job?

VE:     I don't think so.  I think he would have to handle more than three hours a day.

ALJ:    Not the – not the hypothetical person I'm talking about.

VE:     Am I not getting this?  The hypothetical person – based on the hypothetical, you indicated they could reach and handle frequently with the right upper extremity.  Then you indicated that would be three hours a day.  According to the DOT, handling is at frequent which would be up to six hours per day. So what's the max on that?  Three hours or six?

ALJ:    Three.  It's still frequent. . . . .[2]

_____

        [2]  At this point, Petitioner's counsel indicated that he had a question that "may help" clear the apparent confusion between the ALJ and Ms. Lawson.  (AR 64).  Although the ALJ originally stated that he was "not interested in that issue being resolved at the moment," he ultimately allowed Petitioner's counsel to ask Ms. Lawson a series of questions.  (AR 64-66).

**MEMORANDUM DECISION AND ORDER - 10**

ATT:    Ms. Lawson, are folks who perform *this job as chief jailer or jail commander* required to be certified by the state where they perform their duties?

VE:    Yes.

ATT:    And are there certain physical requirements of those individuals in order to be certified?

VE:    Yes.

ATT:    And are they required to attend an academy for certification?

VE:    They are.

ATT:    And are those physical requirements to obtain certification more stringent or more – do they require greater physical exertion than what's been posed in the hypothetical?

VE:    They require in some cases up to medium level and in some cases up to heavy level exertion.

ATT:    and generally you have to be able to run and squat and do physical –

VE:    Fully physically functional.

ATT:    So unless that individual has what I would call POST certificate or a state certificate to perform that job, they would have to become certified within a period of time after being hired in that position, correct?

VE:    Yes, they are required.

ATT:    And so if the person can't meet those physical requirements, they can't perform the job?

VE:    Correct.

ATT:    All right.[3]

(AR 60-66) (emphasis added).

---

    [3] At this point, the ALJ concluded the hearing because of time constraints, and indicated that he would be ordering a supplemental hearing – presumably, the May 16, 2013 video hearing.  (AR 66-67).

**MEMORANDUM DECISION AND ORDER - 11**

Despite what could be perceived as a disconnected back-and-forth between the ALJ and Ms. Lawson over the meaning of "frequent" vis à vis the reaching and handling requirements for a chief jailer, the ultimate take-a-way from her testimony is nonetheless clear: Petitioner cannot perform his past relevant work.  But the ALJ never disputed this, concluding in no uncertain terms that Petitioner "is unable to perform any past relevant work."  (AR 20).  Said another way, any incorporation of Ms. Lawson's December 14, 2012 testimony would have buttressed, rather than detracted from, the Decision's legal conclusions on this issue.  Therefore, any failure to so include such a discussion does not *ipso facto* render the Decision as lacking in substantial evidence.[4]  Hence, Petitioner's argument in this  respect is unavailing.

2.     Any Question Over Whether the Decision Properly Incorporated Dr. Rack's Testimony at the May 16, 2013 Hearing Does Not Render the ALJ's Decision as Lacking in Substantial Evidence

Petitioner appears to make three interrelated arguments concerning the Decision's references to Dr. Rack's testimony at the May 16, 2013 hearing: (1) the Decision's paraphrasing of Dr. Rack's testimony concerning Petitioner's impairments was not consistent with Dr. Rack's actual testimony; (2) the Decision claimed that Dr. Rack testified that Petitioner's impairments do not meet or medically equal a listed impairment when, in fact, he made no such opinion;[5] and

---

[4]  Moreover, regardless of whether the ALJ made specific reference to the existence of the December 14, 2012 hearing in the Decision, he nonetheless considered that hearing in arriving at his disability determination when realizing that (1) the ALJ discussed Petitioner's testimony "[a]t hearing," and (2) Petitioner only testified during the December 14, 2012 hearing, not the May 16, 2013 hearing. (AR 16.)  The upshot of Petitioner's argument in this regard would have greater strength had there been no incorporation of the substance of the December 14, 2012 hearing into the ALJ's decision, but that is not what transpired.

[5]  Whether these first two criticisms are actually one-and-the-same is not immediately clear from Petitioner's briefing.  However, because Petitioner presents them as distinct arguments by way of separate headings, the Court will attempt to address them individually. *See, e.g.*, Pet.'s Brief, pp. 7-12 (Docket No. 16).

**MEMORANDUM DECISION AND ORDER - 12**

(3) Dr. Rack did not testify that Petitioner could perform "limited light work," contrary to the Decision's suggestion otherwise.  *See generally* Pet.'s Brief, pp. 7-15 (Docket No. 16).  These arguments are overstated for the purposes of compelling either a remand of the action or an outright reversal.

> a.     *The Decision Properly Paraphrased Dr. Rack's Testimony*

The Decision references Dr. Rack three different times – first, when he is introduced as the impartial medical expert who testified at the May 16, 2013 hearing; second, when he is referenced in a single sentence as testifying that Petitioner's impairments do not meet or medically equal a listed impairment at step three of the sequential process; and third, when his testimony about Petitioner's two severe impairments is discussed.  (AR 12, 15, & 18). Petitioner's first critique of the ALJ's handling of Dr. Rack's testimony speaks to the third of these three instances.

The ALJ paraphrased Dr. Rack's testimony as follows:

> Impartial medical expert Dr. Rack testified that the claimant has two severe impairments – low back pain syndrome as a result of his lumbosacral condition and chronic pain in his right thumb.  The doctor testified that there are no neurological abnormalities attributable to the claimant's back pain issues and that his right thumb condition is an orthopedic problem.  He also testified that the claimant may have difficulty performing persistent standing and walking due to his pain symptoms and that sitting will be easier for him.  He further testified that the claimant has some limitations due to his right thumb condition. . . . .

(AR 18).  To the extent Petitioner now claims that this specific characterization of Dr. Rack's testimony is somehow incorrect, the undersigned disagrees.

At the May 16, 2013 hearing, Dr. Rack testified in relevant part:

ME:     *I think he has two significant problems.  One is distinct abnormalities with regard to his lumbosacral spine condition called spondylolisthesis which is slippage of foam vertebral bodies one upon the other.*  In association with that, he has had disc bulging at more than one level, 3/4 and 4/5, and he has

**MEMORANDUM DECISION AND ORDER - 13**

had constant pain significant reparable to the low back and with some extending into his lower extremities on occasion. That process continues and represents a significant limitation for him from a pain point of view and for which he does use medications.

*The second problem is that reparable to his right thumb which is, in essence, essentially an orthopedic problem. It has nothing to do with nervous tissue, but he has chronic pain reparable to the right thumb. It has been operated on and still prevents substantial problems for him* and I'm – I don't know what direction is being taken at this point insofar as that problem is concerned, but it is distinctly a different problem than reparable to his low back and neither his thumb or his low back seems to have any relationship to the previous diagnosis of lymphoma. . . . .

So I think from my vantage point where I see myself with these records is as I've described, primarily with regard to his low back and the association of his low back with constant pain and with on occasion leg pain, but that's not been a primary problem. The low back difficulty is apparent on the x-rays that have been done. *There is not a description of distinct neurological abnormalities reparable to the lower extremity and in that regard, I refer to loss of reflexes or loss of strength or loss of muscle bulk. I don't find those type of things described.* What is described is primarily the presence of a constant low-back pain syndrome and I think that's where we presently stand from my vantage point in so far as his condition is concerned.

I think that is should be recognized that he is a big man, carries around a lot of weight, and that certainly is to his disadvantage with regard to his low-back problems because where this slippage is, there's a [inaudible] carry around his weight when he is in an upright position which would only aggravate further the slippage of the bones upon themselves. So I think that's where we are, Your Honor.

ALJ:    *All right. Those are – those are the severe impairments then, is that correct*?

ME:     *Right, I think so.*

ALJ:    *The right – right thumb and – and the – and low back pain syndrom*?

ME:     *Yes.*

ALJ:    Does – does either one of those conditions meet one of the commissioner listings for disabling medical impairments?

**MEMORANDUM DECISION AND ORDER - 14**

ME:     I don't think that's the problem, but again that's an orthopedic problem and not my valleyway [phonetic] but I don't think that that meets or equals a listing. *I think that the low-back problem because of the nature of the problem and the severity of the pain, would be very restrictive factors as far as activities are concerned for him, those that would have to be done in an upright position. I think he would have a lot of difficulty in doing persistent activities being in a standing or walking position. Sitting would be easier for him and he would not have the restrictions as far as sitting is concerned.* So I think that – that – I don't think unequivocally that the low back problems is meeting or equaling a listing, but I think it certainly would restrict significantly what he can do as far as activity is concerned.

(AR 499-501) (emphasis added). This testimony directly aligns with how the ALJ accounted for Dr. Rack's opinions within the Decision. In short, the Decision properly paraphrased Dr. Rack's overall testimony. *But see infra* (discussing separate issue of Dr. Rack's testimony as to whether Petitioner's severe impairments met or equaled a listed impairment).

> **b.**      *Any Mistake in the Reference to Dr. Rack's Opinion on Whether Petitioner's Severe Impairments Met or Equaled a Listed Impairment is Harmless*

Petitioner's second critique of the ALJ's handling of Dr. Rack's testimony turns on the Decision's second reference to Dr. Rack (*see supra* (discussing Decision's three references to Dr. Rack)))  – namely, that Dr. Rack "testified that the claimant's impairments do not meet or medically equal any listings."  (AR 15).  Petitioner claims that this statement "is simply untrue," before highlighting Dr. Rack's responses to Petitioner's counsel's follow-up questions on the subject.  Pet.'s Brief, p. 11 (Docket No. 16).  On this point, Dr. Rack testified:

ATT:    Doctor, would the combination of the back injury, the thumb that needs fused, and the older shoulder injury equal the listing under – for the back in combination?

ME:     Well, you know, I don't know the answer to that.  You're talking about two specific areas that are outside my area of expertise, i.e., his thumb and his shoulder region.  I – I don't think that either of those problems are necessarily new and I think that if the surgical procedure would be of help to

**MEMORANDUM DECISION AND ORDER - 15**

him, one would have thought that that would have been done.  I know – I think he's had one done in the past, but I would have though it would have been redone, but I don't know the answer to your question.  I would tend to confine myself just to his low back.  I – I – honest, on – of itself, I don't think it's going to represent a listing phenomenon and I would say the same thing for his shoulder.  I don't see enough written to indicate that those would fall into a listing category.  Beyond that, whether they are sufficient magnitude to combine with the low back and produce an equaling situation, I would feel very uncomfortable saying yes to that from my specialty point of view.

ATT:   Thank you, doctor.  And then Dr. DiBenedetto, the orthopedic surgeon felt that he had a significant limitation with his right hand and said in I think it was 16F that – I'm sorry, it was 17F, that he had the inability – the inability to grip and hold and his hands have no significant calluses.

Are you able to tell us if he would have limitations in the use of that right hand –

ME:   Well –

ATT:   – or would you defer to the – the orthopedic doctor?

ME:   I would defer to the orthopedist.  What – what – what I noted which probably is a type error, I think that in 17F, reference is made to his left thumb whereas up in 16F, the problem is definitively related to his right thumb so I presume that the problem is with one or the other thumb and presumably the right thumb and I would suspect because of the pain that there would be some limitation in his ability to use the right thumb or the right hand.

ATT:   Okay.  Thank you.

(AR 502-503).

Combined with his earlier testimony in response to questions from the ALJ (*see supra*),

what becomes more apparent to the undersigned is that, while Dr. Rack may have subjectively

believed that Petitioner's severe impairments[6] do not meet or equal a listed impairment, he

---

[6] Dr. Rack's responses to Petitioner's counsel's questions may have presumed that Petitioner's "older shoulder injury" was also a severe impairment that needed to be taken into account at step three of the sequential process.  (AR 502) (posing follow-up question that included Petitioner's "older shoulder injury").  In contrast, the ALJ's questions to Dr. Rack did not include Petitioner's shoulder injury.  Therefore, an argument could be made that the ALJ

**MEMORANDUM DECISION AND ORDER - 16**

would defer to Petitioner's orthopedist as to limitations posed by Petitioner's thumb injury owing to his own lack of medical expertise in that area.  This is arguably a different interpretation of Dr. Rack's testimony than what is reflected in the Decision's lone sentence on this topic.

But even if one were to construe this arguable anomaly as a bona fide shortcoming of the Decision, it must be tempered against the fact that the ALJ did not rely solely upon Dr. Rack's testimony in finding that Petitioner's severe impairments do not meet or equal a listed impairment.  Indeed, the Decision immediately went on to say:

> Moreover, the claimant's impairments do not meet listing 1.02 because the medical record does not support evidence that one major peripheral weight-bearing joint has resulted in an inability to ambulate effectively nor is there evidence to establish that there is one major peripheral joint in each upper extremity resulting in an inability perform fine and gross movements effectively.  The claimant reported that he can perform light household chores such as laundry, mowing the lawn, vacuuming, and watering the plants.  He also reported that he enjoys fishing.  His impairments also do not meeting listing 1.04 because, although the medical record shows that he has degenerative disc disease, the record does not establish evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication of the severity required to meet the listing.

(AR 15) (citing (AR 197-198 & 396)).  Hence, against the fuller backdrop of the ALJ's explanation for his ruling, any arguable mischaracterizing of Dr. Rack's testimony in this limited respect is harmless because other evidence in the record (or lack of evidence as the case may be) supports the ALJ's conclusions.  *See Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) ("an ALJ's error is harmless where it is inconsequential to the ultimate nondisability determination.");

––––––––––––––––––––

accurately re-stated Dr. Rack's opinion (albeit ultimately a qualified one that is more nuanced than the Decision suggests) that Petitioner's severe impairments did not meet or equal a listed impairment, when interpreting Dr. Rack's original responses to the ALJ's questions in that vein. *See* (AR 499-501).  This Memorandum Decision and Order takes no position on such a construction.

**MEMORANDUM DECISION AND ORDER - 17**

*see also supra* (discussing balance of medical record and Petitioner's daily activities as justification for giving "no weight" to Dr. DiBenedetto's opinions).

Although the Court is sympathetic to the fact that Petitioner has severe impairments that impact his physical abilities, the record evidence does not show that he meets or medically equals the requirements of any particular listing. A mention of the *potential* discrepancy in Dr. Rack's testimony is not enough to show how any such error correspondingly undermines the ALJ's disability determination generally, or whether Petitioner has a listed impairment specifically. *See Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999) ("To meet a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his or her claim."); *Fierros v. Colvin*, 2014 WL 1682058, *8-9 (C.D. Cal. 2014) ("'[T]he mere diagnosis of a listed impairment does not establish that the claimant meets a listed impairment.' . . . . Plaintiff relies solely on the fact that his treating physician determined that he met a listing and offers no independent evidence that he meets each characteristic of Listing 12.04 (Affective Disorder) and 12.06 (Anxiety Related Disorders). Since the ALJ properly gave little weight to the treating physician, this is insufficient.") (quoting *Key v. Heckler*, 752 F.2d 1545, 1549-50 (9th Cir. 1985)). The Court therefore denies Petitioner's claim on this issue.

c.      *Dr. Rack's Testimony is Not Inconsistent with the ALJ's Findings*

In rounding out the gist of Dr. Rack's opinions (to complete the ALJ's above-quoted paraphrasing of Dr. Rack's testimony), the ALJ stated:

> Dr. Rack specializes in neurology and is knowledgeable with the Social Security administration disability program. He had an opportunity to examine the claimant's longitudinal medical record in forming an opinion. His opinion regarding the claimant's limitations due to his lower back and right thumb condition are consistent with the overall medical evidence of record. The medical evidence establishes that

**MEMORANDUM DECISION AND ORDER - 18**

> although the claimant may have some functional limitations due to his pain symptoms, he still retains the capability to perform limited light work. Also, the claimant's activities of daily living of going fishing, attending church, and performing light household chores strengthens the doctor's opinion that the claimant has some restrictions, but is not completely immobilized or incapacitated due to his health issues. Accordingly, the undersigned gives Dr. Rack's opinion significant weight.

(AR 18-19). Petitioner disputes this finding, arguing that "Dr. Rack did not testify that the Petitioner could perform 'limited light work,' and actually limited the Petitioner to sedentary work." Pet.'s Brief, p. 14 (Docket No. 16). To the extent Petitioner contends that the ALJ misquoted Dr. Rack, it must be pointed out that the ALJ never said that Dr. Rack opined that Petitioner could perform limited light work. Rather, the ALJ said only that "the medical evidence establishes that . . . [Petitioner] . . . retains the capability to perform light work" before assigning weight to Dr. Rack's opinions. (AR 19).

More fundamentally, though, Dr. Rack's opinion that Petitioner's low back problem would present "difficulty in doing persistent activities being in a standing or walking position" (*see supra* (quoting (AR 501)) does not translate into Petitioner being absolutely precluded from doing limited light work, as Petitioner contends. *See* Pet.'s Brief, p. 15 (Docket No. 16) ("If the Petitioner 'would have a lot of difficulty in doing persistent activities being in a standing or walking position' he could not, by definition, perform light work."). Except, even when focusing only on Dr. Rack's limited testimony in this regard (to the exclusion of the medical evidence in the record reflecting Petitioner's physical capabilities (discussed *infra*)), light work is not limited only to jobs requiring "a good deal of walking or standing"; light work also *includes* jobs that require "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b). Therefore, the fact that the ALJ determined

**MEMORANDUM DECISION AND ORDER - 19**

Petitioner to be capable of performing limited light work is not inconsistent with Dr. Rack's

testimony.

Further, even if it was somehow at odds with Dr. Rack's testimony, in moving to step

five of the sequential process the ALJ did not identify only light work jobs that exist in

significant numbers in the national economy that Petitioner is capable of doing when considering

his age, education, work experience, and residual functional capacity.  Instead, with the

assistance of the impartial vocational expert, Patricia Ayerza, the ALJ *also* identified three

sedentary jobs that exist in significant numbers in the national economy that Petitioner is capable

of doing when considering his age, education, work experience, and residual functional capacity.

(AR 21); *see also, e.g.*, *Reynolds v. Astrue*, 2012 WL 1107649, *21 (D. Md. 2012) (upholding

ALJ's classification of plaintiff's RFC as permitting limited light work rather than sedentary

work where, owing to additional limitations affecting occupational base (such that plaintiff's

residual functional capacity did not align perfectly with given strength category), ALJ consulted

a vocational expert to determine whether jobs exist for someone with such "in-between" residual

functional capacity); *Casey v. Colvin*, 2015 WL 1810173, *8 (W.D. Va. 2015) (same).  With all

this in mind, the ALJ did not commit error when characterizing Petitioner's functional ability as

light or limited light work.  The Court denies Petitioner's claim on this issue.

3.      The ALJ Properly Discounted Dr. DiBenedetto's Opinions

Petitioner saw Dr. DiBenedetto once since March 19, 2009 – Petitioner's alleged

disability onset date.  Following that January 11, 2013 visit,[7] Dr. DiBenedetto indicated that he

---

[7]  In rejecting Dr. DiBenedetto's opinions, the ALJ indicated that "[h]e last treated the claimant back in 2008."  Petitioner appropriately points out that this is not true, noting the

did "not see how [Petitioner] will be able to obtain reasonable work with his current physical

condition."  (AR 468).  The ALJ, however, accorded no weight to Dr. DiBenedetto's assessment.

(AR 20).  Petitioner disagrees.  *See* Pet.'s Brief, p. 13 (Docket No. 16) ("If enough things hadn't

already gone wrong, the ALJ completely discounted any opinions from the Petitioner's

orthopedic physician, Dr. DiBenedetto.").

The Ninth Circuit has held that a treating physician's medical opinion is entitled to

special consideration and weight.  *See Rodriguez v. Bowen*, 876 F.2d 759, 761 (9th Cir. 1989).

The treating physician's opinion is entitled to such deference because "he is employed to cure

and has a greater opportunity to know and observe the individual."  *Id*.  Where the treating

physician's opinions are not contradicted by another doctor, they may be rejected only for clear

an convincing reasons.  *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Even if the

treating physician's opinions are contradicted by another doctor, they can only be rejected if the

ALJ provides specific and legitimate reasons, supported by substantial evidence in the record,

for doing so.  *See id*.

While not commenting here on whether, in fact, Petitioner is disabled, it must be

acknowledged that Dr. DiBenedetto's input concerning Petitioner's vocational abilities is not

without criticism.  First, to the extent Dr. DiBenedetto definitively considers Petitioner disabled,[8]

---

January 11, 2013 visit.  *See* Pet.'s Brief, p. 13 (Docket No. 16).  However, the undersigned is
confident that, in making this statement, the ALJ intended to mean that, before January 11, 2013
(which followed the first hearing before the ALJ), Dr. DiBenedetto last saw Petitioner in 2008.
*See* (AR 39) (Petitioner testifying that "the last records there confirm that November of 2008 and
when we requested the records, we were advised there weren't any after that date from Dr.
DiBenedetto.").  The record not only supports this interpretation, but, additionally, the ALJ
specifically referenced and cited to Petitioner's January 11, 2013 visit with Dr. DiBenedetto in
the Decision in at least two different places.  (AR 17, 20).

   [8]  It is unclear what Dr. DiBenedetto truly means when he states that he does "not see an
opportunity [for Petitioner] to obtain employment within his skills."  (AR 468).  Does Dr.
DiBenedetto feel that Petitioner cannot perform the same jobs as he had in the past or something
different?  As explained earlier in this Memorandum Decision and Order, the fact that a claimant

such an opinion on the ultimate issue here (at least as that term is used within the meaning of the Social Security Act) is neither conclusive nor binding upon the ALJ. *See* SSR 96-5P, 1996 WL 374183, *2 ("The regulations provide that the final responsibility for deciding [whether an individual is 'disabled' under the Act] . . . is reserved to the Commissioner."); 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(3) ("We will not give any special significance to the source of an opinion on issues reserved to the Commissioner . . . ."). Second, Dr. DiBenedetto's opinions are, at best, incomplete toward determining the degree of Petitioner's alleged limitations and, thus, whether he is capable of working at all. As the ALJ indicated, Dr. DiBenedetto "did not administer a straight leg test or range of motion evaluation of the claimant's lumbar spine in making an opinion." (AR 20).[9] Further, elsewhere in the record, Petitioner's physical limitations appear to be less pronounced than what Dr. DiBenedetto believed to be the case. For example:

- In an August 17, 2011 consultative examination with Rob Fuller, M.D, Petitioner could walk without assistance and appeared without distress while sitting/rising and getting on/off the examination table; had a completely full range of motion and intact strength of his lumbar spine; could fully extend his hands with 5/5 grip strength; demonstrated 5/5 strength in his upper and lower extremities; and had negative straight leg raise tests. (AR 16-17) (citing (AR 398-399)). Dr. Fuller also noted that Petitioner "had poor effort and was very evasive and very deliberate in his motions, but with distraction his passive and active motions were absolutely normal." (AR 17-19) (citing (AR 398-399)). Dr. Fuller indicated that Petitioner wore a hand brace to the examination (Petitioner's wife reported that he wore a brace "all the time" (AR 237)) but was seen removing it while walking to his care "where he

---

cannot perform his past relevant work because of his impairments does not mean that he is disabled. *See supra* (discussing step five of the sequential process).

[9] Petitioner concedes that Dr. DiBenedetto did not administer a straight leg test, but says that "he certainly did obtain a range of motion evaluation of the claimant's lumbar spine, as evidenced by the report generated the same day." Pet.'s Brief, pp. 13-14 (Docket No. 16). Yet, there is nothing pointed to by Petitioner where Dr. DiBenedetto performed such an evaluation and the Court could not locate one. This fact, by itself, is not dispositive of the issue.

**MEMORANDUM DECISION AND ORDER - 22**

quickly and adeptly maneuvered his vehicle in a crowded parking lot without any difficulty." (AR 17-18) (citing (AR 397, 399)). From his examination of Petitioner, Dr. Fuller felt that Petitioner "is fully capable of any type of employment for a man his age." (AR 19) (citing AR 399)). Even so, the ALJ only accorded "very limited weight" to Dr. Fuller's opinions because he did not provide an opinion of Petitioner's functional abilities given his impairments. (AR 19).

•    In a July 25, 2011 "Function Report Adult - Third Party," Petitioner's wife, Sandra Emillio-Ennis, reported that Petitioner could lift 20 to 30 pounds. (AR 17, 20) (citing 236)).

•    Petitioner visited Kanisku Health Services at various times in 2011 but failed to mention any serious issues related to his lower back or right hand condition. (AR 18) (citing AR 281-323, 424-449)).

•    Although claiming to have significant limitations with standing, walking, and sitting due to pain, as well as significant limitations with using his right hand, Petitioner apparently performs household chores, including mowing the lawn, laundry, feeding the chickens, and cleaning. (AR 18) (citing AR (233)). He attends church regularly and car shows. (AR 18) (citing (AR 235)). He enjoys fishing and, with assistance, gardening. *Id*. Despite testifying that the longest trip he had taken in the past few years was a one-time trip to California in 2009 or 2010, he reported to Dr. Fuller in 2011 that he travels back-and-forth to California six times yearly. *Compare* (AR 46)*, with* (AR 397, 399). Petitioner collected unemployment benefits after the alleged onset date of disability, confirming that he was willing and able to work during this time. (AR 18) (citing (AR 191)).

•    On September 8, 2011, State agency consultant John Crites, M.D., opined that Petitioner can lift/carry 20 pounds occasionally and 10 pounds frequently in an eight-hour workday; can stand and/or walk for a total of about six hours and sit for a total of six hours in an eight-hour workday; can occasionally crouch and climb ladders, ropes, and scaffolds, as well as frequently kneel, balance, and climb ramps and stairs; and must avoid concentrated exposure to vibration and pulmonary irritants. (AR 19) (citing (AR 69-79)). Still, the ALJ "note[d] that *additional* restrictions have been provided to take into account the claimant's alleged limitations." (AR 19) (emphasis added).

•    During reconsideration, on November 3, 2011, State agency consultant Ward E. Dickey, M.D., opined that Petitioner can lift and/or carry 20 pounds occasionally and 10 pounds frequently in an eight-hour workday; can stand and/or walk for a total of about six hours and sit for a total of about six hours in an eight-hour workday; and can occasionally stoop and crouch. (AR 19)

**MEMORANDUM DECISION AND ORDER - 23**

(citing (AR 81-91)).  But, as with Dr. Crites's opinions, the ALJ "note[d] that *additional* restrictions have been provided to take into account the claimant's alleged limitations."  (AR 19) (emphasis added).

If the record as a whole does not support Dr. DiBenedetto's opinion (e.g., clinical findings from examinations, conflicting medical opinions, conflicting physicians' treatment notes, claimant's daily activities), the ALJ may reject it.  *See supra*; *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004); *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Connett v. Barnhart*, 340 F.3d 871, 874-75 (9th Cir. 2003); *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 600-01 (9th Cir. 1999).  Here, the record illustrates that Petitioner suffers from several severe impairments (acknowledged by the ALJ (*see supra*)) that no doubt impact his ability to work.  However, it cannot be said, as Petitioner does, that the ALJ wrongly discounted Dr. DiBenedetto's opinions.  While Dr. DiBenedetto's assessment may not have been given the weight Petitioner believes was warranted, the ALJ did not consider it in a vacuum, independent of the surrounding medical record.

In its role as a reviewing court, this Court does not resolve the conflicting opinions and ultimately decide whether Petitioner is once-and-for-all disabled as that term is used within the Social Security regulations.  Rather, this Court measures whether or not the ALJ's decision that Petitioner is not disabled is supported by the record.  With this in mind, given the conflicting medical opinions, the ALJ must offer specific and legitimate reasons, supported by substantial evidence in the record, for rejecting Dr. DiBenedetto's medical opinions.  Because the evidence can reasonably support the ALJ's conclusions on such matters, this Court will not substitute its judgment for that of the ALJ's.  *See Richardson*, 402 U.S. at 401; *Matney*, 981 F.2d at 1019.

## IV.  CONCLUSION

The ALJ is the fact-finder and is solely responsible for weighing and drawing inferences from facts and determining credibility.  *Allen*, 749 F.2d at 579; *Vincent ex. rel. Vincent*, 739 F.2d

**MEMORANDUM DECISION AND ORDER - 24**

at 1394; *Sample*, 694 F.2d at 642.  If the evidence is susceptible to more than one rational interpretation, one of which is the ALJ's, a reviewing court may not substitute its interpretation for that of the ALJ.  *Key*, 754 f.2d at 1549.

The evidence upon which the ALJ relied can reasonably and rationally support his well-formed conclusions, despite the fact that such evidence may be susceptible to a different interpretation.  Accordingly, the ALJ's decisions as to Petitioner's disability claim generally, as well has his decisions and discussion of evidence concerning the earlier hearing, including the testimony and records of Dr. Rack and Dr. DiBenedetto specifically, were based on proper legal standards and supported by substantial evidence.  Therefore, the Commissioner's determination that Petitioner is not disabled within the meaning of the Social Security Act is supported by substantial evidence in the record and is based upon an application of proper legal standards.

Accordingly, the Commissioner's decision is affirmed.

## V.  ORDER

Based on the foregoing, the decision of the Commissioner is AFFIRMED and this action is DISMISSED in its entirety with prejudice.

DATED:  **September 25, 2015**

Honorable Ronald E. Bush
U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 25**